765 N.W.2d 469 (2009)
277 Neb. 805
STATE of Nebraska, appellee,
v.
Parry HEDGCOCK, appellant.
No. S-07-617.
Supreme Court of Nebraska. *470 
May 22, 2009.
*474 Brent M. Bloom, Omaha, for appellant.
Jon Bruning, Attorney General, and George R. Love, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
Parry Hedgcock pulled his vehicle into the Platte River rest area immediately after seeing checkpoint signs. These signs were "ruse checkpoint" signs indicating that a drug checkpoint was set up farther down the road when, in reality, there was no checkpoint. At the rest area, Hedgcock was approached by an officer who was wearing plain street clothes and was not displaying his weapon. The officer informed Hedgcock that he was not in any trouble or under arrest. He then asked Hedgcock to answer a few questions, and Hedgcock agreed. After a few minutes of talking with the officer, Hedgcock consented to a search of his vehicle, resulting in the officer's finding marijuana.
As a result of this encounter, Hedgcock was charged with possession of marijuana weighing more than 1 pound and with intent to distribute. The district court denied his motion to suppress certain statements and physical evidence obtained by officers, and Hedgcock was found guilty. He appeals his convictions, alleging that the use of the ruse checkpoint was unconstitutional.

*475 BACKGROUND
On February 22, 2006, the Nebraska State Patrol strategically placed signs along Interstate 80, eastbound, indicating that there was a drug checkpoint farther down the road. The checkpoint signs were posted along the shoulder and the median of Interstate 80 near the Platte River rest area in Cass County. The checkpoint signs read "`Nebraska State Patrol Check Point Ahead'" and "`Drug Dog in Use.'" The signs alternated prior to the exit for the rest area, and a couple of signs were placed after the rest area. However, there was no drug enforcement checkpoint on Interstate 80. The checkpoint signs were placed near the Platte River rest area exit to induce motorists engaged in drug-related activity to take the exit in order to avoid the drug checkpoint.
Five officers, including Officers Alan Eberle, Richard Lutter, and Jason Scott, waited in the rest area either on foot or in unmarked vehicles, with their weapons concealed, wearing plain street clothes. The officers at the rest area observed individuals' behaviors for any indicators or circumstances that would alert them to possible drug activity. In his deposition, Scott testified that some of the indicators the officers looked for included the motorists' reactions to the signs, such as braking rapidly to enter the rest area, how fast the vehicle pulled into the rest area, where the vehicle parked in the rest area, and the passengers' behaviors once the vehicle is parked. If the officers observed any suspicious indicators or circumstances, then they would make contact.
Another officer waited in an unmarked car, in the middle of Interstate 80, observing motorists' reactions to the checkpoint signs. The officer specifically watched for motorists who made a "rapid departure" into the rest area, as such activity was indicative of someone attempting to avoid the checkpoint. The officer was to alert the other officers waiting at the rest area of any motorists' reactions that were suspicious.
At approximately 10:30 a.m., an officer informed Eberle that the driver of a white Chevrolet Blazer, with Utah plates, rapidly applied the brakes and changed lanes to enter the rest area after seeing the checkpoint signs. Eberle testified that after he received that information, he, along with Lutter and Scott, observed the Blazer enter the rest area. Even though there were empty stalls in front of the building, the Blazer parked away from the rest area building.
After the Blazer parked, the occupants, Hedgcock and Anthony Womack, sat inside the vehicle for approximately 2 minutes. Eventually, Womack (the passenger) and Hedgcock (the driver) got out of the vehicle. Womack walked to the restrooms, but Hedgcock stayed close to the Blazer.
This behavior made the officers at the rest area suspicious. Eberle testified that in his experience, when individuals are transporting narcotics, one person always stays close to the vehicle to make sure that it is never left unattended. Scott testified that he was suspicious because Hedgcock parked the Blazer away from the rest area building, Hedgcock and Womack stayed in the Blazer for awhile, and Hedgcock stayed with the vehicle while Womack went to the restroom. Lutter testified that he, too, was suspicious because Womack and Hedgcock stayed in the vehicle for so long after parking and then proceeded to stand near the vehicle for a time "as if they were still trying to determine what they were going to do." Lutter testified that this behavior was inconsistent with regular use of the rest area.
Eberle followed Womack to the restroom and waited out-side for him to come *476 out. After Womack came out of the restroom, Eberle approached him, and they talked for awhile. While Eberle was talking with Womack over by the restrooms, Lutter walked over to the Blazer to talk with Hedgcock. Lutter approached Hedgcock and presented his badge, identifying himself as a law enforcement officer. He then advised Hedgcock that he was not under arrest and that he was not in any kind of trouble. According to Lutter, he asked Hedgcock, in a conversational, nondirective tone, to talk for a minute, and Hedgcock said, "Okay."
Lutter asked Hedgcock for identification, and Hedgcock gave him his Utah driver's license. Hedgcock informed Lutter that he was coming from Utah to Chicago to visit a friend, but Hedgcock could not provide any other details about the trip. Lutter then explained to Hedgcock that he was watching for people that may be transporting illegal items such as guns, drugs, and explosive devices. He then asked Hedgcock whether he had any such items with him or in his vehicle, to which Hedgcock stated he did not. During their conversation, Lutter observed that Hedgcock continued to look away from him as if he was searching for his companion and that Hedgcock appeared to be nervous.
Eventually, Lutter asked Hedgcock for consent to search the Blazer, and Hedgcock responded, "[g]o ahead," and stepped away from the Blazer. Lutter testified that as soon as he opened the passenger-side door to search the Blazer, he smelled burned marijuana. After examining the front compartment, Lutter asked Hedgcock and Womack whether there was marijuana in the vehicle, to which Hedgcock stated that "there might be some in the ash tray." The officers found a marijuana cigarette in the ashtray and continued their search of the vehicle.
Eberle testified that after the marijuana cigarette was found, neither Womack nor Hedgcock was free to leave, because the officers intended to issue a citation. However, the record reveals that neither officer indicated in any way that Womack and Hedgcock were not free to leave. Both officers testified that before the marijuana cigarette was found, Hedgcock and Womack were free to leave at any time.
As the search continued, Eberle asked Hedgcock whether he could search inside the luggage compartment on the top of the Blazer. Hedgcock indicated that a set of keys in the driver's door would open the luggage compartment; however, none of the keys fit the lock. Eberle asked Hedgcock again about how to open the luggage compartment, and Hedgcock told him that he left the key at home. Hedgcock consented to a search of his person, and after searching, Eberle found a single key in Hedgcock's pocket that fit the luggage compartment lock. After finding the key, Eberle asked Hedgcock what was in the luggage compartment that he did not want the officers to find, and Hedgcock stated: "`I'm transporting marijuana.'"
Based on this confession, Eberle arrested Hedgcock. The officers opened the luggage compartment and found three black garbage bags full of marijuana, approximately 50 pounds. Eberle then read Hedgcock his Miranda rights, and Hedgcock agreed to talk.
Eberle asked Hedgcock some questions about where the marijuana was going, but Hedgcock would not give him any details. Hedgcock told Eberle that he was responsible for the marijuana and then requested an attorney. At that point, Eberle stopped questioning him. However, on the way to the police station, Hedgcock made a comment regarding his thoughts on legalizing marijuana.
*477 The district court overruled Hedgcock's motion to suppress as to the physical evidence and the statements he made before asking for an attorney, but granted the motion as to the statements Hedgcock made on the way to the police station. The court concluded that the encounter between Hedgcock and the officers was a tier-one encounter, because Hedgcock voluntarily agreed to talk to the officers and because the evidence did not show circumstances indicative of a seizure. Thus, the encounter did not rise to the level of a seizure and was therefore outside the realm of Fourth Amendment protection. The court also noted that Hedgcock was not stopped at a checkpoint, because he stopped at the rest area on his own volition. The court stated: "The fact that [Hedgcock's] consent to talk to the officer(s) and his consent to the search worked to his detriment does not give rise to an illegal search or seizure." Hedgcock was convicted and sentenced. He now appeals.

ASSIGNMENTS OF ERROR
Hedgcock claims, restated, that the district court erred in overruling his motion to suppress, because (1) the Platte River rest area was in fact an unconstitutional drug checkpoint and (2) the encounter between himself and the officers constituted an unconstitutional seizure.

STANDARD OF REVIEW
In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, we apply a two-part standard of review.[1] Regarding historical facts, we review the trial court's findings for clear error.[2] But whether those facts trigger or violate Fourth Amendment protections is a question of law that we review independently of the trial court's determination.[3]
Likewise, we apply the same two-part analysis when reviewing whether a consent to search was voluntary. As to the historical facts or circumstances leading up to a consent to search, we review the trial court's findings for clear error. However, whether those facts or circumstances constituted a voluntary consent to search, satisfying the Fourth Amendment, is a question of law, which we review independently of the trial court.[4] And where the facts are largely undisputed, the ultimate question is an issue of law.[5]

ANALYSIS
Hedgcock argues that his encounter with Lutter, Eberle, and Scott, which occurred as a result of Hedgcock's entering the Platte River rest area after seeing the ruse checkpoint signs, was a seizure for purposes of the Fourth Amendment. We conclude Hedgcock was not seized; thus the protections of the Fourth Amendment are inapplicable.
It is axiomatic that for the protections of the Fourth Amendment to apply, *478 a seizure must have occurred.[6] A police officer may make a seizure by a show of authority and without the use of physical force.[7] But there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned.[8] Thus, a seizure requires either a police officer's application of physical force to a suspect or a suspect's submission to an officer's show of authority.[9]
To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment, we employ the analysis set forth in State v. Van Ackeren,[10] which describes the three levels, or tiers, of police-citizen encounters.[11]
A tier-one encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning, and does not involve any restraint of the liberty of the citizen involved.[12] In other words, one who voluntarily accompanies the police for questioning has not been seized. Because tier-one encounters do not rise to the level of a seizure, they are outside the realm of Fourth Amendment protection.[13]
We have explained that a seizure does not occur simply because a law enforcement officer approaches an individual and asks a few questions or requests permission to search an area, provided the officer does not indicate that compliance with his or her request is required.[14] Moreover, we have concluded that a police officer's merely questioning an individual in a public place, such as asking for identification, is not a seizure subject to Fourth Amendment protections, so long as the questioning is carried on without interrupting or restraining the person's movement.[15] In other words, a seizure does not occur simply by reason of the fact that a police officer approaches an individual, asks him or her for identification, and poses a few questions to that individual.[16]
Conversely, tier-two and tier-three encounters are seizures sufficient to invoke the protections of the Fourth Amendment. According to Van Ackeren, a tier-two encounter constitutes an investigatory stop as defined by Terry v. Ohio.[17] Such an encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning. Because of its less intrusive nature, a tier-two encounter requires only that an officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that *479 criminal activity is afoot.[18]
Finally, a tier-three encounter constitutes an arrest.[19] An arrest involves a highly intrusive or lengthy search or detention.[20] The Fourth Amendment mandates that an arrest be justified by probable cause to believe that a person has committed or is committing a crime.[21]
A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.[22] In addition to situations where the officer directly tells the suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.[23]
Hedgcock argues that the ruse checkpoint resulted in a de facto checkpoint at the rest area, a tier-two encounter, and that the stop was not justified by specific and articulable facts sufficient to give rise to a reasonable suspicion that criminal activity was afoot. We disagree that this was a tier-two encounter. The police did not use any force to stop the Blazer. Instead, Hedgcock stopped the Blazer on his own accord.[24] Nor did Hedgcock pull into the rest area as a result of a show of authority. There were no uniformed officers or marked police cars directing vehicles into the rest area, and there were no roadblocks. Vehicles were not stopped by officers, and the officers in no way prohibited motorists from continuing their travel. As such, we determine there was no drug checkpoint in this case.[25]
Hedgcock maintains that the facts in U.S. v. Yousif[26] compel the same analysis and conclusion that an unlawful seizure took place in this case. However, Yousif is readily distinguishable. In Yousif, the Eighth Circuit Court of Appeals was presented with a case where, as in the present case, ruse checkpoint signs were strategically placed to trick drug traffickers into leaving the highway at an exit ramp to avoid the perceived checkpoint. The signs indicated that a drug checkpoint was beyond the exit. Unlike this case, however, law enforcement officers actually established a checkpoint on the exit ramp and were under instructions to stop every vehicle that exited the highway at that exit.
In Yousif, when a vehicle would arrive at the checkpoint, at least one uniformed officer would approach the driver and ask for his or her driver's license, registration, and, if required by the state of registration, proof of insurance. Then, if the officers perceived any indication of illegal activity, the officer would question the driver *480 further, and if there was any reason to believe that the vehicle contained illegal drugs or other contraband, the officer would ask for consent to search.
Salwan Yousif took the exit and was stopped at the checkpoint, and three officers approached the vehicle Yousif was driving. Yousif consented to a search of the vehicle, and the search revealed Yousif was transporting bundles of marijuana. The Eighth Circuit concluded that the district court erred in denying Yousif's motion to suppress, because the stop was not supported by reasonable suspicion.[27] Specifically, the court stated:
[B]ecause there is nothing inherently unlawful or suspicious about a vehicle (even one with out-of-state license plates) exiting the highway, it should not be the case that the placement of signs by the police in front of the exit ramp transforms that facially innocent behavior into grounds for suspecting criminal activity.[28]
In a later case, the Eighth Circuit clarified its holding in Yousif, stating that exiting a highway immediately after observing signs for a checkpoint is "`indeed suspicious, even though the suspicion engendered is insufficient for Fourth Amendment purposes.'"[29] In other words, the court concluded that exiting a highway to avoid the use of a drug checkpoint is one factor which can be considered in the totality of the circumstances, but that if it is the only cause for suspicion, it is insufficient.
It is clear that in this case, no checkpoint existed at the rest area. Vehicles were not stopped by law enforcement officers, and officers simply approached individuals, whose behaviors displayed certain suspicious indicators, for brief, nonthreatening questioning. From our review of the record, the individuals had in their possession all necessary items such as identification, driver's license, keys, et cetera, to continue traveling if so desired. Thus, there was no checkpoint.
Next, Hedgcock argues that he was seized during the encounter in which Lutter asked him questions and for consent to search. The State maintains that no seizure took place, because Hedgcock voluntarily, without being coerced, agreed to answer questions. We agree with the State.
Considering the totality of the circumstances, we find that a reasonable person would have felt free to leave; thus, there were no circumstances present in this case which are indicative of a seizure. There were no more than three officers visible to Hedgcock at any point prior to his admissions. All of the officers at the rest area were dressed in plain clothing, and none of the officers displayed their weapons. The officers did not physically compel cooperation in any way.
Additionally, Lutter did not indicate that compliance with his request to answer questions would be compelled. Lutter did not summon Hedgcock to his presence, but instead Lutter approached Hedgcock and identified himself. When Lutter first spoke with Hedgcock, Lutter's tone of voice was "[s]trictly conversational, there was no direction, it was just a conversation tone." Almost immediately, Lutter informed Hedgcock that he was not under arrest or in any kind of trouble. Lutter simply asked Hedgcock "if he had a few minutes to speak with me." And Hedgcock responded, "Okay."
*481 Moreover, it is clear that Hedgcock had everything in his possession that he would need to continue his trip. Lutter requested, but did not demand, Hedgcock's identification, and after checking Hedgcock's identification, Lutter immediately returned his driver's license back to him. Hedgcock was free to walk away at any time. There is nothing to indicate that this encounter was intense or threatening.
To sum up, the record reveals that Hedgcock voluntarily cooperated and consented to a search of the Blazer and his person. Lutter asked Hedgcock, in a conversational tone, whether he could search the vehicle, and Hedgcock responded, "Go ahead." At the time Lutter asked for consent to search the Blazer, no other officers were around. Additionally, there is no evidence of any kind of coercive conduct on the part of the officers. Lutter did not make any demands of Hedgcock, and throughout this short encounter, Hedgcock never manifested any indication that he no longer wanted to cooperate with the officers. Hedgcock never asked whether he was free to leave, and he never made any attempts to leave. Hedgcock fully cooperated with the police officers.
Based on these facts, we see no reason to conclude that a reasonable person in Hedgcock's position would not have felt free to decline the request to answer questions or to search.
But Hedgcock argues that an encounter that occurs as a result of a ruse checkpoint is inherently unreasonable and coercive. Hedgcock argues that his initial cooperation was involuntary because he was forced to cooperate. According to Hedgcock, if he refused to cooperate and then was allowed to leave, he would have been stopped at the checkpoint. But if he cooperated, he might be released without being stopped again at the checkpoint.
We have held that police deception which is not coercive in nature will not invalidate an individual's consent to search if the record otherwise shows the consent was voluntary.[30] Although the officers misrepresented the fact that a drug checkpoint was beyond the rest area, there was nothing in the record to reveal that the officers coerced Hedgcock into answering questions or consenting to a search of the Blazer. And as we discussed above, the officers did not force Hedgcock into stopping at the rest area and none of the officers indicated in any way that cooperation would be compelled. We determine that the use of a ruse checkpoint, without an unreasonable seizure for Fourth Amendment purposes, is not unconstitutional simply because it is a ruse. As such, we conclude that Hedgcock voluntarily consented.

CONCLUSION
We conclude that the encounter between Lutter and Hedgcock did not rise to the level of a Fourth Amendment seizure. Because there was no seizure, there was no checkpoint and the safeguards against unreasonable searches and seizures were not implicated. Further, we determine that Hedgcock voluntarily cooperated and consented to the search of his vehicle and person. Therefore, we conclude the district court correctly denied Hedgcock's motion to suppress, and thus, we affirm.
AFFIRMED.
NOTES
[1] See, State v. Royer, 276 Neb. 173, 753 N.W.2d 333 (2008); State v. Konfrst, 251 Neb. 214, 556 N.W.2d 250 (1996). See, also, State v. Rogers, 277 Neb. 37, 760 N.W.2d 35 (2009).
[2] See id.
[3] See id.
[4] See, Wyche v. State, 987 So.2d 23 (Fla. 2008); State v. Texter, 923 A.2d 568 (R.I. 2007); State v. Giebel, 297 Wis.2d 446, 724 N.W.2d 402 (2006); Robinson v. Com., 47 Va.App. 533, 625 S.E.2d 651 (2006); Graham v. State, 146 Md.App. 327, 807 A.2d 75 (2002); Vargas v. State, 18 S.W.3d 247 (Tex.App. 2000).
[5] See State v. Lancelotti, 8 Neb.App. 516, 595 N.W.2d 558 (1999), citing U.S. v. Nicholson, 144 F.3d 632 (10th Cir. 1998).
[6] See, State v. Anderson, 258 Neb. 627, 605 N.W.2d 124 (2000), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007). See, also, State v. Soukharith, 253 Neb. 310, 570 N.W.2d 344 (1997); State v. Twohig, 238 Neb. 92, 469 N.W.2d 344 (1991).
[7] See State v. Cronin, 2 Neb.App. 368, 509 N.W.2d 673 (1993).
[8] See id.
[9] Id.
[10] State v. Van Ackeren, 242 Neb. 479, 495 N.W.2d 630 (1993).
[11] See id.
[12] Id.
[13] Id.
[14] State v. Anderson, supra note 6. See State v. Twohig, supra note 6.
[15] State v. Twohig, supra note 6.
[16] See United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
[17] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[18] See, State v. Van Ackeren, supra note 10; Terry v. Ohio, supra note 17.
[19] State v. Van Ackeren, supra note 10.
[20] Id.
[21] Id.
[22] State v. Anderson, supra note 6.
[23] Id.; U.S. v. Galvan-Muro, 141 F.3d 904 (8th Cir.1998), citing U.S. v. White, 81 F.3d 775 (8th Cir.1996), and United States v. Mendenhall, supra note 16.
[24] See U.S. v. Klinginsmith, 25 F.3d 1507 (10th Cir.1994).
[25] See, U.S. v. Wright, 512 F.3d 466 (8th Cir.2008); U.S. v. Carpenter, 462 F.3d 981 (8th Cir.2006).
[26] U.S. v. Yousif, 308 F.3d 820 (8th Cir.2002).
[27] Id.
[28] Id. at 829.
[29] U.S. v. Carpenter, supra note 25, 462 F.3d at 986.
[30] State v. Peery, 223 Neb. 556, 391 N.W.2d 566 (1986).