compensation court, the evidence in the record supports a finding that she suffered a cumulative, repetitive trauma injury in January 2011.

[11] Although we need not address this argument in order to resolve this case, we do note that this issue was not assigned as error in Hadfield's brief. Errors argued but not assigned will not be considered on appeal. *Sheperd v. Chambers*, 281 Neb. 57, 794 N.W.2d 678 (2011).

## CONCLUSION

We conclude that the compensation court's order of dismissal did not comply with rule 11(A), because it failed to clearly address whether it had considered Hadfield's injuries under a cumulative, repetitive trauma theory. Therefore, we reverse the judgment and remand the cause to the compensation court with directions to consider this matter under a cumulative, repetitive trauma theory.

Reversed and remanded with directions.

---

State of Nebraska, appellee, v.
Stewart O. Newman, appellant.
___ N.W.2d ___

Filed July 16, 2013.    Nos. A-12-404, A-12-405.

1.  **Constitutional Law: Search and Seizure: Motions to Suppress.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.
2.  **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** For the protections of the Fourth Amendment to apply, a seizure must have occurred. A seizure requires either a police officer's application of physical force to a suspect or a suspect's submission to an officer's show of authority.
3.  **Search and Seizure.** Determinations as to whether a person has been seized are questions of fact.
4.  **Constitutional Law: Search and Seizure.** A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave.

5. **Police Officers and Sheriffs: Search and Seizure.** In addition to situations where an officer directly tells the suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

6. ____: ____. The question of whether a person's consent to accompany law enforcement officials was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of the circumstances.

7. ____: ____. A request to accompany law enforcement to a police station for questioning does not carry an implication of obligation so awesome for a suspect that it renders his actions involuntary.

8. **Constitutional Law: Search and Seizure: Waiver.** Both the U.S. and Nebraska Constitutions guarantee the right to be free from unreasonable searches and seizures. That right may be waived by consent.

9. **Warrantless Searches: Proof.** When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.

10. **Warrantless Searches: Police Officers and Sheriffs.** A warrantless search is valid when based upon consent of a third party whom the police, at the time of the search, reasonably believed possessed authority to consent to a search of the premises, even if it is later demonstrated that the individual did not possess such authority.

11. **Speedy Trial.** Neb. Rev. Stat. § 29-1207 (Cum. Supp. 2012) provides that, in general, a defendant must be brought to trial within 6 months after the filing of the information, unless the 6 months are extended by any period to be excluded in computing the time for trial.

12. ____. If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, he or she shall be entitled to an absolute discharge from the offense charged.

13. **Judgments: Speedy Trial: Appeal and Error.** As a general rule, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous.

14. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.

15. **Indictments and Informations: Speedy Trial.** When determining the impact the filing of an amended information has on speedy trial considerations, it is important to determine whether the amendment charges the same or a totally different crime, and if it does not change the nature of the charge, then the time continues to run against the State for purposes of the speedy trial act.

16. **Indictments and Informations.** An amended information which charges a different crime, without charging the original crime(s), constitutes an abandonment of the first information and acts as a dismissal of the same.

17. **Sexual Assault: Words and Phrases.** Neb. Rev. Stat. § 28-319.01 (Cum. Supp. 2012) provides, in relevant part, that a person commits sexual assault of a child in the first degree when he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older.

18. ____: ____. Neb. Rev. Stat. § 28-318(6) (Reissue 2008) defines sexual penetration as meaning sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes.

19. **Convictions: Evidence: Appeal and Error.** In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

20. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

21. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

22. **Sentences.** In imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

23. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeals from the District Court for Douglas County: J. Patrick Mullen, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Jeanine E. Tlustos for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Inbody, Chief Judge, and Irwin and Moore, Judges.

Irwin, Judge.

## I. INTRODUCTION

Stewart O. Newman appeals his convictions and sentences on one count of first degree sexual assault of a child and six counts of visual depiction of child pornography. On appeal, Newman challenges rulings of the district court for Douglas County overruling two motions to suppress, overruling a motion to discharge, finding sufficient evidence to support the sexual assault conviction, and imposing sentences. We find Newman's assertions on appeal to be meritless, and we affirm.

## II. BACKGROUND

This case involves allegations of first degree sexual assault of a child and visual depiction of child pornography involving one young girl, who was born in March 1999 and was approximately 10 years of age at the time of the events giving rise to these criminal charges. To protect her anonymity, we will simply refer to her as "Jane" (as in "Jane Doe") throughout this opinion. In addition, inasmuch as the factual background of this case is graphic, our explanations of the testimony will be only as detailed as necessary to explain the underlying legal analysis that results in affirmance of Newman's convictions.

In February 2010, Jane sent her mother a text message indicating that Newman had been "trying to have sex with [her]." Jane's mother called the 911 emergency dispatch service and reported the allegations and then took Jane to "Project Harmony," where she was interviewed by a member of the Omaha Police Department's special victims/child sexual assault unit. After Jane's interview with law enforcement, Newman was arrested. Sometime later, Newman's wife contacted law enforcement about suspecting that there was child pornography on a laptop computer in Newman's home, and a search of that laptop revealed a variety of suspected pornographic images of children, including photographs of Jane.

### 1. JANE'S TESTIMONY AND INTERVIEW

Jane testified at trial, recounting the history of Newman's conduct toward her. Jane testified that Newman began speaking with her about sex when she was approximately 6 years of age. She testified that when she was approximately 7 or 8 years of age, she observed Newman looking at pornography on a computer and Newman began showing her pornographic images. She testified that when she was 6 years of age, Newman began touching her "private parts" with his hands, and that when she was approximately 8 years of age, he touched her "private" with his "private." She testified that he also would sometimes "touch [her] private" with his mouth and "lick [her] private."

Jane testified that there were occasions where Newman and Jane would both be unclothed and Newman would rub his penis on her vagina, rubbing it "back and forth." She testified that Newman rubbed his penis "inside the folds" of her vagina and that he would then instruct her to lie on her stomach. She testified that after she lay on her stomach, Newman would rub his "front area" on her "bottom," with his penis "on top of [her] hole area," and that eventually "white stuff" would come out of Newman's penis, which she could feel on her back.

Jane testified that she was approximately 8 years of age when Newman first showed her what came out of his penis. She testified that Newman had told her her "opening" was too small for his penis to go inside of and that nothing ever went inside the "hole" of her vagina or the "hole" of her "butt area." She testified, however, that when Newman would lick her vaginal area, she could feel the "folds" of her vagina "coming apart."

Jane also testified that in September 2009, when she was 10 years of age, Newman took photographs of her without any clothes on. She testified that Newman "posed" her in certain positions in the photographs. At trial, six photographs were received into evidence and the parties stipulated that the photographs were of Jane. These photographs depict Jane, including her genitalia, and Newman's penis is depicted in more than one

of the photographs. In one of the photographs, Jane's hand is holding Newman's penis and pointing it at her vagina.

Det. Robert Butler testified that he interviewed Jane at Project Harmony in February 2010. Detective Butler testified that Jane had described to him that Newman had "separat[ed]" the labia of her vagina with his tongue and with his penis. He testified Jane had indicated that Newman put his tongue "inside of her" and that although Newman's licking of her vagina was sometimes on the "outside," it was "most[ly]" on the "inside."

### 2. Newman's Statements and Testimony

On or about February 12, 2010, after Jane reported Newman's conduct to her mother and Jane was interviewed at Project Harmony, Omaha law enforcement officers made contact with Newman at his home. Two detectives in plain clothes and two uniformed officers made contact with Newman. The detectives advised Newman that they wanted to conduct a formal interview with him at the police station, and Newman agreed to accompany them. Newman was then transported to the police station in an unmarked vehicle. According to one of the detectives, Newman never expressed any reluctance to accompanying them.

At the police station, Newman was advised of his rights from a standard rights advisory form and was interviewed. The interview lasted approximately 2 hours and was recorded, with both audio and video. During the interview, Newman never indicated that he wanted to stop the interview and never asked to speak with an attorney.

During the interview, Newman initially denied that any sexual assault had occurred. Eventually, however, he acknowledged the conduct and indicated that it had "snowballed" from touching to instances of oral sex. During the interview, Newman indicated that on at least one occasion, Jane had put her mouth on his penis.

At trial, Newman testified in his own behalf. Although he acknowledged that he had made statements during the interview about Jane's placing his penis in her mouth, he denied that such conduct ever occurred. He testified that he showed

Jane what a "blow job" was by showing her a video on the computer. He also denied ever placing his mouth on Jane's vaginal area.

Newman acknowledged that he had watched pornography with Jane and had shown her pornography on a computer. He testified that Jane had heard about sex from other girls and asked him questions about it, and he testified that he thought he could "curb [her] curiosity" by watching pornography with her. He testified that the "wors[t]" the conduct ever got between him and Jane was "showing each other" and "a little bit of touching" and "some rubbing." He testified that he did not know what had been in his mind to make him remove his pants while looking at pornography with Jane.

Newman testified that he "only ejaculated on [Jane] once," in 2009. He testified that he rubbed his penis on her "bottom" while looking at pornography with her, and he acknowledged that Jane may have rubbed her hands on his penis to make it erect.

Newman testified that there were approximately six instances of some contact in 2009, that he "probably" rubbed his penis on Jane five of those times, and that he ejaculated on one occasion. He testified that this conduct occurred with clothes on, and described that he would stand between Jane's spread legs while rubbing back and forth. He testified that initially, he was trying "to educate" Jane.

Newman acknowledged that he had posed Jane and taken pictures of her in the nude. He acknowledged that one of the photographs received into evidence depicted his erect penis with Jane's hand around it. He testified that the photographs were taken on the same occasion when he ejaculated. Newman testified that Jane "wanted" the photographs taken.

Although Newman testified that he had shown pornography to Jane, that he had viewed pornography with Jane, that he and Jane had become naked in each other's presence and had engaged in "showing each other" and "a little bit of touching" and "some rubbing," that Jane had rubbed his penis on at least one occasion, that he had ejaculated after rubbing his penis against Jane's bottom, and that he had posed Jane and taken a number of pictures of her nude genitalia and a

photograph of her hand around his penis, Newman denied that any penetration ever occurred during any of the instances with Jane.

### 3. LAPTOP COMPUTER

Approximately 1 week after Newman was arrested, his wife (now his ex-wife) contacted law enforcement officers because, while she was using a laptop computer in their house, she discovered "inappropriate" Web sites in the computer's browser history. During a hearing on a motion to suppress, she testified that the Web sites had names that included such words as "little models" and "incest." She testified that she observed a picture (which she did not describe) and "shut it down real quick" before calling law enforcement.

Newman's wife testified that she and Newman shared expenses, had combined financial accounts, and usually made joint decisions regarding purchases. She testified that the two had purchased two computers with a joint tax refund and that although one of the computers was primarily used by her and one primarily used by Newman, she had access to both computers and had business files on the computer primarily used by Newman that she accessed frequently. She testified that the computer was owned jointly and that she gave law enforcement permission to search the computer.

Newman's wife testified that on the occasion on which she discovered the questionable content that caused her to contact law enforcement, she was not required to log onto the computer because it was already "booted up" and was on the kitchen counter in the house.

Newman's wife testified that both computers had, at one time, required the same password for logging on, because both she and Newman used both computers. She testified that Newman had changed the password on the subject computer in November or December 2009, because the couple had a teenage girl staying with them and Newman had wanted to keep her from being able to access the Internet through the computer. Newman's wife testified that she did not recall whether Newman had told her the new password; she was never actually asked whether she knew the password, but

she testified that she knew typical words that Newman used as passwords.

One of the detectives involved in the investigation of the case testified that Newman's wife contacted law enforcement approximately 1 week after Newman's arrest and indicated that she had found child pornography on a computer primarily used by Newman. The detective testified that he understood she had access to the computer and that law enforcement obtained her permission to search the computer. He testified that he believed the computer was password protected, but that Newman's wife provided law enforcement with the password. He testified that he believed the password was written on a slip of paper found inside the laptop computer's case.

After the computer was booked into property, a forensics analysis was performed. The law enforcement officer who performed the analysis testified that he believed the other officer provided him with the password for the computer, but that he did not need the password because he was able to use a forensics software program to view files on the computer without use of the password. He later testified at trial that he did not have the password for the computer.

The officer who performed the forensics analysis testified that he found evidence of child pornography on the computer and that law enforcement then decided to obtain a search warrant to make a full analysis of the computer. After a search warrant was obtained, 11 images of Jane and more than 90 images of other children were located. He testified that many of the images of other children were consistent with images in a Nebraska State Patrol repository of known child pornography and were downloaded to the computer through a peer-to-peer program called LimeWire. The officer who performed the forensics analysis also testified that he found information on the computer concerning numerous Web sites catering to people looking for images of young children and teenagers.

### 4. Procedural Background

On February 17, 2010, Newman was charged by information with first degree sexual assault of Jane. On March 1,

Newman was charged by information with six counts of visual depiction of child pornography.

### (a) Suppression

Prior to trial, Newman sought to suppress evidence obtained from the search of the laptop computer. Newman also sought to suppress statements made during his February 12, 2010, interview.

On February 28, 2011, the district court denied Newman's motion to suppress evidence obtained from the computer. The court found that the computer was jointly purchased and owned by Newman and his wife, that his wife had mutual access to and use of the computer, and that she gave the password to law enforcement. The court also found that law enforcement was reasonable in believing Newman's wife had authority to provide consent for a search of the computer and that Newman had waived any privacy interest in the computer when he left it logged on in a common area of the house.

On June 15, 2011, the district court denied Newman's motion to suppress statements. The court found that Newman had voluntarily accompanied law enforcement to the police station and had been properly advised of his rights before he made incriminating statements.

### (b) Discharge

On July 29, 2010, Newman waived his right to speedy trial concerning the then-pending first degree sexual assault of a child charge and the six visual depiction of child pornography charges.

In May 2011, a second amended information was filed concerning the child pornography charges. In the second amended information, Newman was charged with 10 counts of visual depiction of child pornography and 10 counts of possession of child pornography. In January 2012, Newman filed a motion for discharge concerning the child pornography charges, alleging that more than 6 months had elapsed since the filing of the second amended information.

In response to Newman's motion to discharge, the State filed a motion to dismiss the 14 additional charges which were

included in the second amended information. The court granted this motion, leaving Newman again charged with six counts of visual depiction of child pornography. The district court denied the motion to discharge, finding that after the State dismissed the additional charges, Newman remained in exactly the same position as he had been in when he waived his right to speedy trial in July 2010.

### (c) Verdict and Sentencing

Newman waived his right to jury trial. After a trial to the bench, the district court found Newman guilty of one count of first degree sexual assault of a child and guilty of six counts of visual depiction of child pornography. The court sentenced Newman to a term of 45 to 70 years' imprisonment on the sexual assault conviction. The court sentenced Newman to concurrent sentences of 5 to 10 years' imprisonment on each of the child pornography convictions. The court ordered the concurrent child pornography sentences to be served consecutively to the sexual assault sentence. In addition, Newman was required to comply with Nebraska's Sex Offender Registration Act. This appeal followed.

## III. ASSIGNMENTS OF ERROR

On appeal, Newman challenges the district court's denial of each of his motions to suppress, the court's denial of his motion to discharge, the sufficiency of the evidence to support the sexual assault conviction, and the sentences imposed by the district court.

## IV. ANALYSIS

### 1. MOTIONS TO SUPPRESS

[1] Newman challenges the district court's denial of his motions to suppress statements he made to law enforcement investigating the claim of sexual assault and to suppress evidence of child pornography obtained from law enforcement's search of a laptop computer. In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d

882 (2010); *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id*. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *Id*. We find no merit to either assertion.

### (a) Statements

Newman first asserts that the district court erred in denying his motion to suppress statements made during his initial interview with law enforcement. His argument is premised on an assertion that law enforcement effected an unlawful arrest of him at his home and that the entire subsequent interview at the police station was fruit of the poisonous tree. We agree with the district court that the circumstances demonstrate that Newman made a voluntary statement, after being fully advised of his rights, and we find no merit to this assertion of error.

[2,3] It is axiomatic that for the protections of the Fourth Amendment to apply, a seizure must have occurred. *State v. Hedgcock, supra*. A seizure requires either a police officer's application of physical force to a suspect or a suspect's submission to an officer's show of authority. *Id*. Determinations as to whether a person has been seized are questions of fact. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993).

[4,5] A seizure in the Fourth Amendment context occurs only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he or she was not free to leave. *State v. Casillas, supra*; *State v. Hedgcock, supra*. In addition to situations where the officer directly tells the suspect that he or she is not free to go, circumstances indicative of a seizure may include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the citizen's person, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *State v. Hedgcock, supra*.

[6] The question of whether a person's consent to accompany law enforcement officials was in fact voluntary or was

the product of duress or coercion, express or implied, is to be determined by the totality of the circumstances. *State v. Bronson, supra*.

In *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990), the Nebraska Supreme Court addressed the admissibility of statements made after the defendant accompanied law enforcement to the police station. In that case, the defendant was suspected of being involved in a homicide and, while driving his automobile, was stopped by a police cruiser accompanied by an unmarked police vehicle. The defendant was asked to accompany law enforcement to the police station. The defendant asked whether he could leave his vehicle where it was parked, was cooperative and agreed to accompany law enforcement, and was transported in an unmarked police car. He was not handcuffed.

[7] The Nebraska Supreme Court held that the record "clearly demonstrate[d] that [the defendant] voluntarily cooperated with the police." *Id*. at 782, 457 N.W.2d at 440. The court concluded that given the totality of the circumstances, the trial court was not clearly wrong in concluding that no unlawful seizure had occurred when law enforcement stopped the defendant, asked him to accompany them to the police station, and transported him to the police station for an interview. *State v. Victor, supra*. The court specifically rejected the assertion that a request to accompany law enforcement "to a police station for questioning carries an implication of obligation so awesome for a suspect that it renders his actions involuntary." *Id*. at 782, 457 N.W.2d at 441.

Similarly, in *State v. Bronson*, 242 Neb. at 935, 496 N.W.2d at 887, police officers made contact with the defendant at his house, explained that they wanted to "'talk to him at Central Police Headquarters,'" and transported him to the police station for an interview. The defendant "was not threatened, coerced, or promised anything, was not told he was under arrest, was not handcuffed, and rode in the back seat of [an] unmarked police car with the two officers in the front." *Id*. The defendant was described as "calm and cooperative." *Id*.

In that case, the Nebraska Supreme Court again held that the defendant had voluntarily accompanied law enforcement

to the police station. *State v. Bronson*, 242 Neb. 931, 496 N.W.2d 882 (1993). The court held that despite the fact that the defendant was interrogated in privacy and in unfamiliar surroundings, considered from a totality of the circumstances, the situation did not rise to the level of a custodial seizure. *Id*.

The facts of the present case are substantially similar. One of the detectives involved in the investigation testified that he, another detective, and two uniformed officers went to Newman's house and made contact with him. The detective testified that Newman "actually may have come out prior to [their] knocking on [the door]," but that he could not recall exactly. He testified they advised Newman that his name had come up in an investigation and that they wanted to conduct a formal interview at the police station. Newman "was receptive and he agreed to accompany" the officers. Newman was then transported in an unmarked vehicle with the two plainclothes detectives. The detective also testified that he did not believe Newman was handcuffed (and later testified Newman was not in handcuffs when he arrived in the interview room at the police station) and that Newman was not advised he was under arrest. He testified that Newman never became reluctant or indicated that he was unwilling to accompany law enforcement. Once in the interview room, Newman was advised of his rights from a standard rights advisory form before making any statements.

There is no indication in the record that any law enforcement officer displayed a weapon, physically touched Newman, or otherwise took action to suggest that Newman was compelled to accompany them. There is no indication that any law enforcement officers took any action to suggest that Newman was threatened or coerced into accompanying them. Rather, the totality of the circumstances indicates that Newman was asked to accompany law enforcement and that he willingly and voluntarily did so.

As in *State v. Bronson, supra*, and *State v. Victor*, 235 Neb. 770, 457 N.W.2d 431 (1990), the totality of the circumstances in this case indicates that Newman voluntarily accompanied law enforcement to the police station and was not unlawfully

seized at his home. As such, we find no merit to Newman's assertion that the district court erred in denying his motion to suppress statements.

### (b) Search of Laptop

Newman next asserts that the district court erred in denying his motion to suppress evidence of child pornography found on a laptop computer. His argument is premised on an assertion that his wife lacked authority to grant consent for a search of the laptop and that she did not know the password to access the laptop. We find that the district court did not err in finding that his wife had authority to consent to the search, and we reject this assertion of error.

[8-10] The Nebraska Supreme Court recently addressed the issue of shared authority to consent to a search in *State v. Reinpold*, 284 Neb. 950, 824 N.W.2d 713 (2013). Both the U.S. and Nebraska Constitutions guarantee the right to be free from unreasonable searches and seizures. *State v. Reinpold, supra*. That right may be waived by consent. *Id*., citing *State v. Konfrst*, 251 Neb. 214, 556 N.W.2d 250 (1996). When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *Id*. Furthermore, a warrantless search is valid when based upon consent of a third party whom the police, at the time of the search, reasonably believed possessed authority to consent to a search of the premises, even if it is later demonstrated that the individual did not possess such authority. *Id*.

In *State v. Reinpold, supra*, the defendant rented one of six apartments located in a single dwelling owned by his parents. At the time, the dwelling was also occupied by the defendant's grandparents and uncle. The defendant, his grandparents, and his uncle were the only occupants of the dwelling, and all used the basement of the dwelling for storage. Both the defendant and his uncle stored property in the northeast corner of the basement. The defendant subsequently moved

from the dwelling, but left belongings in the basement storage area.

After the defendant had moved from the dwelling, his grandparents located a laptop computer in his former apartment and, while examining it, discovered images of suspected child pornography. When the defendant's uncle contacted him about the laptop computer, the defendant denied owning it. The defendant subsequently went to the dwelling to retrieve the laptop computer, and its location was unknown to the date of the Supreme Court's opinion.

During a subsequent investigation, law enforcement was informed about the images that had been viewed on the laptop computer and the defendant's grandparents and uncle informed law enforcement that the defendant had stored several computer hard drives in the basement of the dwelling. They led the investigating officer to the northeast corner of the basement, where three hard drives were located and seized. Subsequent searches of the hard drives revealed suspected child pornography.

In *State v. Reinpold, supra*, the Nebraska Supreme Court held that the district court was not clearly wrong in finding that the defendant's grandparents and uncle had actual and/or apparent authority to consent to a search of the northeast corner of the basement area. The evidence demonstrated that the defendant's grandparents and uncle had unfettered access to the basement and that the defendant's uncle stored items in the northeast corner of the basement. There was no evidence adduced to demonstrate that the investigating officer had any information to suggest that the defendant had exclusive use of the northeast corner of the basement. Thus, the Supreme Court rejected the defendant's assertion that the search was performed without valid consent.

Similarly, the evidence in the present case indicates that Newman's wife had actual and/or apparent authority to consent to a search of the laptop computer. Newman's wife testified that the laptop computer was owned jointly and that there was business information located on it that she "used frequently." She testified that the parties shared expenses, had combined checking accounts, and usually made joint decisions about

purchases. She testified that the laptop computer was purchased by the parties with a joint tax refund. She testified that they purchased two laptop computers at the same time, that the one in question was primarily used by Newman, and that both parties had access to the laptop computers.

Newman's wife testified that when she discovered the questionable content on the laptop computer in question, it had been located on the kitchen counter and it was "already booted up," so she did not need to enter a password to use it. She testified that Newman had changed the password for accessing the computer in November or December 2009 to prevent a teenager who had been staying with them from being able to access the Internet. She testified that she could not recall whether Newman had told her the new password, but that they "[t]ypically . . . used similar" passwords and that she was aware of other passwords that Newman utilized. She was never asked whether she knew the password or whether she provided the password to law enforcement.

One of the detectives testified that Newman's wife contacted law enforcement about having found possible child pornography on the laptop computer. He testified that she indicated she had found the possible child pornography "on a computer primarily used by" Newman and that it was decided law enforcement could seize the laptop computer because it was joint property. He testified that law enforcement obtained permission from Newman's wife to search the laptop computer and that she signed a standard consent-to-search form. He testified that his understanding was that Newman's wife had access to the laptop computer.

We conclude that the district court was not clearly erroneous in finding that Newman's wife had actual and/or apparent authority to consent to a search of the laptop computer. Newman's assertion of error is without merit.

## 2. Motion to Discharge

Newman next challenges the district court's denial of his motion to discharge the child pornography charges brought against him. His argument is premised on an assertion that the filing of a second amended information resulted in

charges different from those previously charged and to which he had waived speedy trial protections and that more than 6 months passed before he was brought to trial on the charges in the second amended information. We find no merit to Newman's assertion.

[11,12] As Newman correctly notes on appeal, Neb. Rev. Stat. § 29-1207 (Reissue 2008 & Cum. Supp. 2012) provides that, in general, a defendant must be brought to trial within 6 months after the filing of the information, unless the 6 months are extended by any period to be excluded in computing the time for trial. See *State v. Florea*, 20 Neb. App. 185, 820 N.W.2d 649 (2012). If a defendant is not brought to trial before the running of the time for trial, as extended by excluded periods, he or she shall be entitled to an absolute discharge from the offense charged. *Id*.

[13,14] As a general rule, a trial court's determination as to whether charges should be dismissed on speedy trial grounds is a factual question which will be affirmed on appeal unless clearly erroneous. *Id*. To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below. *Id*.

[15,16] In *State v. French*, 262 Neb. 664, 633 N.W.2d 908 (2001), the Nebraska Supreme Court addressed the State's filing of an amended information and such filing's impact on speedy trial considerations. The court concluded that "[i]t is important to determine whether the amendment charges the same crime or a totally different crime" and held that "[i]f the amendment to the . . . information does not change the nature of the charge, then obviously the time continues to run against the State for purposes of the speedy trial act." *Id*. at 670, 633 N.W.2d at 914. An amended information which charges a different crime, without charging the original crime(s), constitutes an abandonment of the first information and acts as a dismissal of the same. See *id*.

In the present case, the initial information charging Newman with child pornography alleged that he had committed six counts of visual depiction of child pornography between February 13 and 24, 2010. With respect to those charges,

Newman specifically waived his right to speedy trial. The second amended information included 10 counts of visual depiction of child pornography and 10 counts of possession of child pornography. Certainly, the amended information charged additional crimes for which a new speedy trial clock would begin and for which Newman's prior waiver of speedy trial would not be effective.

However, at the hearing on Newman's motion to discharge, the State dismissed the 14 additional charges alleged in the second amended information. Thus, the State elected to proceed with prosecution of Newman only on the original six counts of visual depiction of child pornography with which he had been charged in the original information, and for which he had specifically waived his right to speedy trial.

The district court found that upon the State's dismissal of the additional charges in the second amended information, Newman remained in the same position as he had been at the time he waived his right to speedy trial: charged with six counts of visual depiction of child pornography. We find no error in this ruling, and we find no merit to Newman's assertion that the court erred in denying his motion for discharge of the child pornography charges.

### 3. SUFFICIENCY OF EVIDENCE

Newman next asserts that the district court erred in finding sufficient evidence to sustain his conviction for first degree sexual assault of a child. His argument is premised on an assertion that the State failed to adduce sufficient evidence to demonstrate that penetration occurred. Newman's assertions on appeal amount to challenges to the credibility of the victim, and there was sufficient evidence to sustain the conviction. As such, we find no merit to this assertion of error.

[17] Neb. Rev. Stat. § 28-319.01 (Reissue 2008 & Cum. Supp. 2012) provides, in relevant part, that a person commits sexual assault of a child in the first degree when "he or she subjects another person under twelve years of age to sexual penetration and the actor is at least nineteen years of age or older." There is no issue in this case concerning the ages of Newman or the victim. Newman was born in 1971 and was

37 or 38 years of age during the relevant time period; the victim was born in 1999 and was 10 years of age during the relevant time period. Newman's assertions on appeal concern only the sufficiency of the evidence concerning "sexual penetration."

[18] Neb. Rev. Stat. § 28-318(6) (Reissue 2008) defines sexual penetration as meaning

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes.

Section 28-318(6) also indicates that "[s]exual penetration shall not require emission of semen."

[19] In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id*.

In this case, the victim (Jane) testified about Newman's conduct. She testified that Newman began touching her private parts when she was approximately 6 years of age and that the conduct ended when she was 10 years of age. She testified that Newman "rubbed on" her by putting "his privates on [her] front private." She testified that Newman's touching of her happened "[t]oo many times to count."

Jane testified that when she was approximately 6 years of age, Newman primarily "touch[ed] [her] private parts with his hands" and that, although "usually [her clothes] were on, . . . sometimes they were off." She testified that when she was 7 or 8 years of age, Newman began showing her pornography and began touching "his private parts on [her]

private parts." She testified that Newman would sometimes touch her private parts with his mouth and that he would "lick [her] private."

Jane testified about Newman's touching of his private parts to her private parts. She described that both she and Newman would have their clothes off and that Newman would rub his penis on her vagina. She specifically testified that Newman would rub "inside the folds of [her] vagina." She testified that "like halfway through he'd tell [her] to get on [her] stomach" and that he would then rub "his front area on [her] bottom." She testified that Newman would rub his penis on the "inside just on top of the hole area" of "[her] butt." She testified that "a white stuff came out, and then he'd just wipe the white stuff off with like a sock or a towel." She testified that Newman ejaculated "[o]nto [her] back area."

Jane also testified that when Newman would lick her vagina, she remembered "like the folds coming apart."

On cross-examination, Jane agreed that she had told law enforcement during her interview at Project Harmony that nothing ever went inside "the hole" of her vagina or her anus. She also acknowledged that if there were differences in her memory of what happened between her testimony at trial and statements she made during the Project Harmony interview, her memory at the time of the Project Harmony interview was probably more accurate. She denied that her story of what had happened had changed, however. On redirect examination, she again testified that she remembered that she could feel that Newman was rubbing his penis inside the folds of her vagina.

Detective Butler, who conducted the interview of Jane at Project Harmony, was asked whether Jane described "any penetration" by Newman with his penis or hands, and he responded "no." Detective Butler testified, however, that his supplemental report referenced Newman's "penetrating [Jane's] vaginal area with his tongue, separating the labia minor[a] and the majora, and also rubbing her vaginal area with his penis, separating the labia minor[a] and the majora and rubbing his penis inside her butt, but not inside the hole." He testified that he did not go over the legal definition of "penetration" with

Jane. Detective Butler was asked whether Jane indicated that Newman put his tongue "inside of her" and "[u]p into the hole" and "in the hole," and he responded, "Yes. She said that she could feel it inside of her."

Newman testified in his own behalf. During his testimony, he acknowledged that the videotape of his initial interview with law enforcement revealed that he had made statements to law enforcement indicating that Jane had put her mouth on his penis, but he denied that it ever happened. He also denied ever putting his mouth on Jane's vagina. He acknowledged occasions between him and Jane of "showing each other" and occasions of "a little bit of touching" and "a little bit of some rubbing." He testified that Jane "might have rubbed her hands on [his penis] a couple of times" to help him get erect. He acknowledged ejaculating onto Jane on one occasion.

Newman's argument on appeal is that the above evidence is not sufficient to sustain a factual finding that there was sexual penetration. He argues that during her initial interview, Jane indicated there had been no penetration, and that she acknowledged at trial that her memory would have been more accurate at the time of the initial interview than at trial. According to Newman, the only evidence of penetration was statements of Jane made more recently and "[i]t is likely that these later statements were not as accurate as the statements that [Jane] made during the initial interview at Project Harmony." Brief for appellant at 28.

We find no merit to Newman's assertion of error. As recounted above, Detective Butler's report of the initial interview of Jane indicated that she had described Newman's separating the labia of her vagina with both his tongue and his penis and that she described Newman's placing his tongue "inside of her." Jane testified at trial that Newman licked her and rubbed his penis "inside the folds" of her vagina. Newman himself acknowledged having made statements to law enforcement indicating that Jane placed her mouth on his penis, although he denied at trial that any such conduct happened. Newman's argument on appeal is entirely an assertion that the testimony of Jane and Detective Butler should not be

found credible; credibility is not an issue we resolve on appellate review.

There was clearly sufficient evidence from which a rational trier of fact could find that there was "any intrusion, however slight, of any part of [Newman's] body . . . into the genital or anal openings of [Jane's] body which can be reasonably construed as being for nonmedical or nonhealth purposes." See § 28-318(6). Newman's assertion that there was insufficient evidence to sustain a conviction for first degree sexual assault of a child is meritless.

### 4. EXCESSIVE SENTENCES

Newman's final assertion of error is that the district court abused its discretion by imposing excessive sentences. Newman's argument on appeal is not that the sentences imposed were outside of the relevant statutory limits, but, rather, that the court should have given more consideration to mitigating factors and imposed less harsh sentences. We find no abuse of discretion.

[20,21] The standard for reviewing an excessive sentence claim is well established. *State v. Wills*, 285 Neb. 260, 826 N.W.2d 581 (2013). An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *Id*. An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

[22,23] In imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

We have recounted in a fair amount of detail throughout this opinion what the evidence in this case demonstrated: Newman, while 37 or 38 years of age, engaged in a pattern of sexual conduct with a child, beginning when she was 6 years of age and continuing until she reported it at 10 years of age. The evidence indicates that the conduct included touching, licking, and rubbing of genitals and ejaculation on more than one occasion. Newman was convicted of first degree sexual assault of a child and six counts of visual depiction of child pornography related to photographs he took of the 10-year-old victim. Those photographs depict the child in the nude, posed, with her breasts and genitals exposed, and include an image of the child's hand gripping Newman's erect penis.

At trial, Newman did not dispute that he had engaged in this inappropriate conduct, except to assert that there had never been penetration. He attempted to explain his behavior by indicating that the child in this case had asked questions about sex and that he thought these actions would "curb [her] curiosity" and "educate" her. Newman acknowledged that he took photographs of Jane that included "posing" of her, but testified that the 10-year-old child wanted the photographs taken.

At sentencing, the sentencing court in this case described Newman's conduct as grooming of this victim. The court concluded that Newman had not shown any remorse or understanding of the "psychic pain" that he had caused the victim. The court found that Newman is a predator and a threat to vulnerable children and noted that he not only sexually assaulted this young child, but also photographed her, evidencing his enjoyment.

The court sentenced Newman to a term of 45 to 70 years' imprisonment for the first degree sexual assault of a child conviction, to be served consecutively with six concurrent sentences of 5 to 10 years' imprisonment on each of the visual depiction of child pornography convictions. These sentences were all within the statutory limits, and the sentences on the child pornography convictions were near the low end of the sentencing range. In light of the nature of the offenses and the circumstances of this case, there was no abuse of

discretion by the sentencing court. This assertion of error is meritless.

## V. CONCLUSION

We find no merit to Newman's assertions of error. The district court did not err in denying his motions to suppress or his motion for discharge. There was sufficient evidence to sustain the convictions. The sentences imposed were not excessive. As such, we affirm.

AFFIRMED.