UNITED STATES of America, Appellee,

v.

Hewey Lee THOMPSON, Appellant.

No. 78–2120.

United States Court of Appeals,
Ninth Circuit.

May 16, 1979.

---

Kenneth C. Bauman, Asst. U. S. Atty., Portland, Or., on brief; Frank A. Wilson, Asst. U. S. Atty., Portland, Or., for appellant.

Mark E. Griffin, Asst. Federal Public Defender, Portland, Or., for appellee.

Before WRIGHT and GOODWIN, Circuit Judges, and THOMPSON *, District Judge.

GOODWIN, Circuit Judge:

Hewey Lee Thompson appeals from a conviction of possession of items stolen from the mail in violation of 18 U.S.C. § 1708. The denial of Thompson's motion to suppress evidence presents the principal question on appeal. We reverse.

On February 7, 1978, at approximately 10:45 a.m., Portland Police Officers Charles Ault and Henry Dunn stopped a car that Thompson was driving in a residential area of northeast Portland. The vehicle had a broken taillight lens, was traveling at a speed which slightly exceeded the "reasonable and safe" speed for that area, and had rolled through a stop sign.

The officers asked the driver for his driver's license. Thompson responded that he did not have it with him. Ault then asked Thompson for anything that had his name on it. Thompson produced on envelope

---

* The Honorable Bruce R. Thompson, United States District Judge for the District of Nevada, sitting by designation.

bearing the name Hewey Thompson and an address. Ault then asked Thompson to step out of his car and come to the police car so that a radio check could be run on his driver's license. This was stated to be standard police procedure; the officers testified that their standard procedure also requires a pat-down search for weapons of anyone about to be placed in a police car.

Ault told Thompson to put his hands on top of the patrol car so that a pat-down search for weapons could be conducted. During the pat-down, Ault said, Thompson removed his left hand from the police car three or four times and attempted to reach for his inside coat pocket "as if [he were] going for something". Ault testified that he could not determine what it was that Thompson was reaching for. Thompson was wearing a long, bulky overcoat. Ault testified that "[j]ust to pat it you couldn't feel sufficiently to find anything out." The officers warned Thompson that if he did not stop trying to reach for his inside coat pocket, they would have to handcuff him. Despite this warning, Ault testified, Thompson again attempted to reach for his inside coat pocket whereupon the officers handcuffed him.

Ault next reached into the coat pocket that Thompson had been attempting to reach. The officer pulled out an envelope, open at the top. Ault could see that the envelope contained checks, although he could not see the names on any of the checks. At this point, Ault admitted, he was not concerned that the envelope might

contain a weapon. Without asking Thompson's permission or inquiring whether the contents would help confirm Thompson's identity, however, Ault removed the checks from the envelope and examined them. Observing a name that had been mentioned in a recent stolen-property report, Ault arrested Thompson.

Thompson was indicted for possession of checks stolen from the mail. 18 U.S.C. § 1708. Thompson moved to suppress the checks found in the envelope. The motion was followed by a hearing at which both officers testified.

Although he denied the motion, the trial judge suggested that *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny, may have required Ault to return the envelope unopened to Thompson's pocket once he determined it did not contain a weapon. The judge's concern was correct. *Terry* does not permit a search into the envelope on these facts.

We examine four possible intrusions into rights protected by the Fourth Amendment: the stop, the pat-down search, the removal of the envelope from the coat pocket, and the inspection of the envelope's contents.

■ 1. *The stop.* Ault and Dunn said they observed Thompson commit three traffic infractions: operating a motor vehicle with a broken taillight lens;[1] driving a motor vehicle in excess of the basic speed rule;[2] and rolling through a stop sign.[3] All

---

1. A violation of Or.Rev.Stat. § 483.406, which provides:

"(1) Every motor vehicle, trailer, semitrailer, and pole trailer or other vehicle being drawn at the end of a train of vehicles, shall be equipped with at least one tail lamp mounted on the rear which when lighted emits a red light plainly visible from a distance of 500 feet to the rear. In the case of a train of vehicles only the tail lamp on the rearmost vehicle need actually be visible from the distance specified.

\* \* \* \* \* \*

"(5) A person who violates this section commits a Class B traffic infraction."

2. A violation of Or.Rev.Stat. § 487.465, which provides:

"(1) A person commits the offense of violating the basic speed rule if he drives a vehicle upon a highway at a speed greater than is reasonable and prudent, having due regard to the traffic, surface and width of the highway, the hazard at intersections, weather, visibility and any other conditions then existing.

\* \* \* \* \* \*

"(3) Violating the basic speed rule is a Class B traffic infraction."

3. A violation of Or.Rev.Stat. § 487.120, which provides:

"(1) A driver commits the offense of failure to obey an official traffic control device if he does not obey the directions of an official traffic control device \* \* \*.

three violations are Class B traffic infractions under Oregon law. Having witnessed these violations, the officers were justified in detaining Thompson and his vehicle under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ 2. *The pat-down search.* Thompson's inability to produce a valid driver's license upon request indicated that he was driving without a license in his possession, and that he may also have been driving without a license having been issued to him. Either default is a violation of Oregon law.[4] Thompson's inability to produce adequate identification justified the request that he get out of his car and sit in the police car while a standard police identification process took place. Under the circumstances, the actions of the officers, including the pat-down, were also reasonable under *Terry.* See *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Madril,* 445 F.2d 827 (9th Cir. 1971), *vacated on other grounds,* 404 U.S. 1010, 92 S.Ct. 692, 30 L.Ed.2d 657 (1972).

■ During the pat-down, Thompson repeatedly attempted to reach for his inside coat pocket, despite the officers' repeated warnings not to. On these facts, we believe the handcuffing was also justified as a reasonable implementation of police duty under *Terry* and *Mimms.*

■ 3. *The search of the pocket.* Had Thompson been lawfully arrested, the intrusion into his pocket and the removal of the envelope might have been justified as a search incident to the custodial arrest. *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Ault admitted, however, that Thompson was not under arrest when Ault reached into his pocket.[5] Under Oregon law, in order to arrest a driver for a Class B traffic infraction, an officer must be able to point to specific articulable facts justifying his or her decision to lodge the person in jail rather than giving the person a traffic citation. See *State v. Tucker,* 34 Or.App. 203, 209–10, 578 P.2d 803, 807 (1978); *State v. Carter,* 34 Or.App. 21, 32, 578 P.2d 790, 796 (1978) (en banc).[6] As Ault's testimony on cross-examination reveals, he did not fulfill this requirement. Thus, Thompson was not under arrest for a violation of state law when Ault reached into his pocket. He could not

* * * * * *

"(5) A person who fails to obey an official traffic control device commits a Class B traffic infraction."

4. Or.Rev.Stat. § 482.040, provides:

"(1)(a) No person * * * shall drive any motor vehicle upon a highway in this state unless upon application he has been licensed as an operator or chauffeur under the provisions of this chapter.

* * * * * *

"(c) A person who violates this subsection commits a Class B traffic infraction.

* * * * * *

"[(2)](b) The licensee shall have such license in his immediate possession at all times when driving a motor vehicle, and shall display it upon the demand of a justice of the peace, a peace officer, or a field deputy or inspector of the division. It is a defense to any charge under this subsection that the person so charged produce in court an operator's or chauffeur's license that had been issued to him and was valid at the time of his arrest.

"(c) A person who violates this subsection commits a Class D traffic infraction."

5. Ault's testimony included this exchange:

"Q. At the point that you handcuffed Mr. Thompson, went inside of his pocket and found the envelope; you didn't know what you were going to find in the envelope, is that correct?

"A. I didn't know that I was going to find an envelope. I didn't know what I was going to find.

"Q. You were just suspicious is that correct?

"A. Yes.

"Q. And as I understand it at that point you had not arrested him for any crime?

"A. No. I had not."

6. In *Carter,* the en banc Oregon Court of Appeals, in addition to explaining the state's "legislative preference for issuance of citations in lieu of custodial arrests", 34 Or.App. at 32, 578 P.2d at 796, went on to interpret the state statutory limitation on *searches* of motorists stopped for traffic offenses. Since we find the examination of the contents of Thompson's envelope violative of the federal Constitution, we need not reach the propriety under state law of the probe of the pocket or the examination of the contents of the envelope. *See, e. g., United States v. Grajeda,* 587 F.2d 1017 (9th Cir. 1978).

have been under arrest for possession of the stolen checks at this point, either. The officers had no logical basis to believe he had committed that crime. Because the defendant was not under arrest at the time of the search, the propriety or impropriety of removing the envelope must be judged, not under *Robinson,* but under *Terry.*[7]

In *United States v. Hill,* 545 F.2d 1191, 1193 (9th Cir. 1976), this court held that *Terry* does not limit a weapons search to a pat-down. Any reasonably limited intrusion designed to discover guns, knives, clubs, or other instruments of assault is permissible. Ault's reaching into the defendant's coat pocket to determine whether he was carrying a weapon constituted such a limited intrusion; it did not transgress the limitations of the Fourth Amendment. Thompson's repeated efforts to reach into his pocket despite the officers' warnings not to, coupled with Ault's inability to determine from a pat-down whether the pocket of the bulky coat contained a weapon, justified the probe of the pocket.

4. *The examination of the envelope.* The examination of the contents of the envelope, on the other hand, violated Thompson's Fourth Amendment rights. Once Ault had felt the envelope and removed it from the coat pocket, he had no concern that it might contain a weapon. He admitted he was merely "suspicious" about the envelope. In fact, the government's brief concedes that "[o]nce the envelope was removed from defendant's coat pocket, it was ascertained that it did not contain any weapons." Thus, Ault's opening of the envelope and examination of its contents was not "an intrusion reasonably designed to discover instruments of assault" as required by *Terry. United States v. Hill,* 545 F.2d 1191, 1193 (9th Cir. 1976); *cf. United States v. Robinson,* 414 U.S. 255–59, 94 S.Ct. 467 (1973) (Marshall, J., dissenting).

The Supreme Court has held "that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope." *Terry v. Ohio,* 392 U.S. at 17–18, 88 S.Ct. at 1878 (citing earlier decisions). While Ault's "frisk" of Thompson for weapons was constitutionally valid at its inception, the officer's intrusion into the envelope transgressed the limits of a *Terry* search. *See Tinney v. Wilson,* 408 F.2d 912, 915–17 (9th Cir. 1969).

In its brief, the government argues that the intrusion into the envelope was reasonable as a "brief identity search", relying on *United States v. Sedillo,* 496 F.2d 151 (9th Cir.), *cert. denied,* 419 U.S. 947, 95 S.Ct. 211, 42 L.Ed.2d 168 (1974). A close reading of *Sedillo* indicates that the intrusion involved in that case was justified under the plain view doctrine and not on the theory of a "brief identity search", a justification in which we find no merit. The officers here had already been given a name and address by Thompson, and Ault admitted that their planned check with state motor vehicles would have verified this information. Moreover, the officers had nothing but an unfounded hunch that whatever they might find in the envelope would help prove or disprove the data Thompson gave them. In short, without reaching the question whether an "identity search" could ever be reasonable under the Fourth Amendment, we hold that the search of the envelope under the circumstances was unreasonable.

*Conclusion.* Ault's discovery of the stolen checks in Thompson's envelope did not follow a lawful arrest, and resulted from an unconstitutional extension of a "frisk" for weapons. We conclude, therefore, that the search violated the constitutional rights of the defendant and that his motion to suppress the checks as fruits of an unconstitutional search and seizure should have been granted. *See Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

Reversed and remanded.

---

7. The prosecution does not argue that Thompson's actions gave the officers probable cause to believe that evidence of a crime was on his person.