suspension; driving during revocation; refusing to comply with the orders of police; and hindering, delaying, or interrupting an arrest. Ortega's criminal history demonstrates a continued disregard for the lawful authority of police and the laws governing the operation of motor vehicles in the State of Nebraska. This assignment clearly lacks merit.

## CONCLUSION

We find no merit to Ortega's assertion that the district court's order in forma pauperis had the legal effect of denying his appellate counsel payment for their representation. Further, the district court was not the proper court to address the issue of attorney fees. To the extent that the district court's order granting leave to proceed in forma pauperis may be understood as addressing attorney fees, we vacate the order. As to Ortega's other claims, the record establishes that his guilty pleas were entered knowingly, voluntarily, and intelligently and that his sentences were not excessive. We affirm the judgment of the district court, which affirmed Ortega's convictions and sentences.

AFFIRMED IN PART, AND IN PART VACATED.

HEAVICAN, C.J., participating on briefs.

————————

STATE OF NEBRASKA, APPELLEE, V.
ARON D. WELLS, SR., APPELLANT.
___ N.W.2d ___

Filed February 20, 2015.    No. S-14-331.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Convictions: Appeal and Error.** In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and

a conviction will be affirmed, in the absence of prejudicial error, if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction.

3. **Constitutional Law: Search and Seizure.** The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution, guarantee against unreasonable search and seizure.

4. **Search and Seizure: Evidence: Trial.** Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.

5. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure: Appeal and Error.** To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters.

6. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure.** A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of the liberty of the citizen.

7. **Police Officers and Sheriffs: Search and Seizure**. A tier-two police-citizen encounter constitutes an investigatory stop as defined by *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Such an encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning.

8. **Police Officers and Sheriffs: Search and Seizure: Arrests.** A tier-three police-citizen encounter constitutes an arrest. An arrest involves a highly intrusive or lengthy search or detention.

9. **Constitutional Law: Police Officers and Sheriffs: Search and Seizure**. Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.

10. **Investigative Stops: Police Officers and Sheriffs.** When conducting an investigatory stop, an officer must employ the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

11. ____: ____. An investigatory stop requires only that an officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that criminal activity is afoot.

12. **Investigative Stops: Police Officers and Sheriffs: Probable Cause.** Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances and must be determined on a case-by-case basis.

13. **Police Officers and Sheriffs: Probable Cause.** In determining whether a police officer acted reasonably, it is not the officer's inchoate or unparticularized suspicion or hunch that will be given due weight, but the specific reasonable inferences which the officer is entitled to draw from the facts in light of the officer's experience.

14. **Investigative Stops: Probable Cause: Appeal and Error.** An appellate court reviews the district court's finding of reasonable suspicion de novo.

15. **Constitutional Law: Search and Seizure.** Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment to the U.S. Constitution, subject only to a few specifically established and well-delineated exceptions.

16. **Warrantless Searches.** The warrantless search exceptions recognized by the Nebraska Supreme Court include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.

17. **Search and Seizure: Arrests.** A search made without a warrant is valid if made incidental to a lawful arrest.

18. **Police Officers and Sheriffs: Search and Seizure: Arrests.** After an arrest is made, the arresting officer may search the person to remove any weapons that the latter might seek to use in order to resist arrest or effect his or her escape and also to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.

19. **Arrests.** Neb. Rev. Stat. § 28-1409(2) (Reissue 2008) diminishes the common-law right to resist unlawful arrest and provides that regardless of whether the arrest is legal, one may not forcibly resist an arrest.

20. **Criminal Law: Evidence: Appeal and Error.** The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

21. **Evidence: Appeal and Error.** As with any sufficiency claim, regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.

22. **Police Officers and Sheriffs: Assault.** Neb. Rev. Stat. § 28-931 (Cum. Supp. 2010) provides that a person commits the offense of assault on an officer in the third degree if he or she intentionally, knowingly, or recklessly causes bodily injury to a peace officer and the offense is committed while such officer is engaged in the performance of his or her official duties.

23. **Criminal Law: Words and Phrases.** Neb. Rev. Stat. § 28-109(4) (Reissue 2008) defines physical pain as a bodily injury.

Appeal from the District Court for Lancaster County: Stephanie F. Stacy, Judge. Affirmed.

Mark E. Rappl for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Heavican, C.J., Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Heavican, C.J.

## NATURE OF CASE

Aron D. Wells, Sr., was convicted in the district court for Lancaster County, Nebraska, of one count of third degree assault of an officer and one count of possession of a controlled substance. Wells alleges that the court erred in overruling his motion to suppress evidence and that there was insufficient evidence to sustain a conviction of assault on an officer. We conclude that the district court did not err in denying Wells' motion to suppress and that there was sufficient evidence to support a conviction.

## BACKGROUND

On January 13, 2012, investigators Timothy Cronin and Scott Parker, police officers serving on the Lincoln/Lancaster County drug task force, were conducting surveillance in Lincoln, Nebraska. The investigators were wearing plain clothes and were in an unmarked car in the parking lot of a local fast-food restaurant located on the corner of 13th and E Streets. Cronin described the area immediately surrounding 13th and E Streets as the "epicenter of narcotics" in Lincoln. Cronin testified that his opinion was based on numerous narcotics arrests made in that area, interviews from confidential informants, "proffer interview reports," police intelligence reports, and results of the police department's undercover controlled substances purchase operations.

The investigators were positioned in the parking lot so that they could observe activity occurring at a gas station and convenience store located across the street from the fast-food restaurant. At approximately 5 p.m., the investigators observed a black 1976 Buick pull into the convenience store parking lot. Cronin believed the driver to be an individual whom Cronin had previously arrested for narcotics possession. Cronin was also familiar with reports that the driver of the Buick had previously purchased drugs from an undercover officer. Cronin testified that he had also received "more recent" police intelligence regarding the driver's involvement with narcotics, but did not elaborate.

Over the course of 10 minutes, Cronin and Parker observed "five to six" people approach the driver's side front window of the Buick, stay for "[j]ust a matter of seconds," and then leave. Cronin could not tell whether the window was down, but he assumed it was down based on how the individuals interacted with the driver. Cronin did not observe anyone carrying anything to the car or carrying anything after leaving the car. Based on what he observed, Cronin did not get the impression that the individuals approaching the car were there to shop at the convenience store. Cronin suspected the driver of selling narcotics and explained that based on his experience and training, it was common for drugs to be sold from vehicles either by the potential buyer or seller contacting the driver at a car window or by the driver's having the buyer or seller enter the car, driving the car around the block, and then dropping off the buyer or seller.

Cronin recognized one of the individuals that approached the Buick as Wells. Cronin had had numerous contacts with Wells and had previously arrested Wells on a drug offense. After Wells walked away from the Buick, the investigators observed Wells flag down a Ford Contour driving eastbound on E Street. The Ford stopped, and Wells had a 10- to 15-second conversation with the two occupants of the car. Wells pointed to a nearby parking lot. The Ford drove to the parking lot, and Wells began to walk toward the parking lot. The investigators drove their unmarked car to that parking lot and parked 10 to 20 feet away from the Ford.

The investigators approached the Ford with their badges out and service weapons visible. Cronin observed that Wells was in the back seat on the passenger side of the Ford. Cronin made eye contact with Wells as Cronin neared the rear passenger door. Cronin recognized the driver of the Ford as a known drug trafficker/user, because the driver was easily recognizable by his facial tattoos. As the investigators approached the car, Cronin testified that he saw Wells digging into Wells' right pocket and that Wells' arm appeared to be under his jacket. Cronin testified that he "was very concerned [Wells] was either retrieving or hiding a weapon, or hiding narcotics on his person." When Cronin arrived at the car,

Wells' arm was still underneath his jacket. Cronin opened the door, grabbed control of Wells' arm, and pulled Wells out of the car.

After Wells was removed from the car, Cronin placed him in handcuffs. Cronin testified that he asked Wells "if he had anything on him" and that Wells replied he did not. Cronin initially testified that he "asked him if [he] could search him" and that Wells replied that he could. Cronin later testified that he asked Wells if he "could pat him down." Cronin then "began doing a pat search and search of his pockets where [Wells] was digging at." Cronin put his fingers into a coin pocket on the right side of Wells' pants and felt a plastic baggie. Cronin could not tell if there was anything in the baggie, but suspected it might contain a controlled substance.

Cronin testified that after he put his fingers in Wells' pocket, Wells tried to spin around. Wells began kicking backward toward Cronin and struck Cronin in the knee and thigh area four or five times. Cronin stated that the kicking hurt for about a minute but did not leave any lasting injuries. After Wells began struggling, Cronin and Parker "took [Wells] to the ground." The investigators observed a large pool of blood coming from Wells' face while he was lying on the ground. Cronin testified that after Wells was lying on the ground, Wells told the investigators that they could not search him.

After Wells was subdued, Cronin searched Wells' coin pocket and discovered baggies of crack cocaine and marijuana. Wells was not charged in connection with the marijuana. At trial, Wells stipulated that the other baggie did indeed contain crack cocaine. According to a police officer who arrived after the altercation occurred, Wells told that officer that Cronin had punched him and that Cronin did not have probable cause to search Wells.

Wells was taken to the hospital to receive treatment for his injuries. After the altercation with Wells, Cronin had a small cut on his hand and went to the hospital to receive treatment as well. Cronin testified that while they were both at the hospital, Wells apologized for kicking Cronin. Cronin stated that he did not prompt Wells to speak to him and that he did not ask Wells any questions.

Wells' testimony at trial presented a different version of the events. Wells testified that he flagged down the Ford in the street to ask the driver for a ride. According to Wells, the driver said that he would give Wells a ride, but he needed to clean out the back seat of his car, and that that was the reason why the Ford had pulled into the parking lot. Wells testified that while he was in the back seat, Cronin came up to the car and pulled Wells out. After being placed in handcuffs, Cronin asked Wells if he could search him and Wells stated that he said no. Wells also explained in his testimony that based on how he was positioned against the car, it would have been impossible for him to kick Cronin the way Cronin alleged. Wells admitted that he did pull away from Cronin while he was being searched, but that he never tried to fight Cronin. Instead, according to Wells, Cronin punched him in the face, put him in a choke hold, and threw him to the ground. Wells also denied that while at the hospital, he apologized to Cronin for kicking him. On cross-examination, Wells admitted to having crack cocaine in his pocket and admitted to using crack cocaine before the incident. Wells estimated that he probably smoked the crack cocaine 30 minutes before his contact with the investigators.

At trial, Wells filed a motion to suppress, seeking an order to suppress all evidence seized from him on January 13, 2012. Making essentially the same argument Wells now makes on appeal, he argued that Cronin's initial detention or arrest of Wells was an illegal seizure under the Fourth Amendment and that Cronin's warrantless search of Wells constituted an illegal search under the Fourth Amendment. On November 19, 2013, the district court overruled Wells' motion to suppress. The district court noted that it "found Cronin's testimony to be credible, both as it respected the area of 13th and 'E' Streets generally, and as it respected the events of January 13, 201[2]."

As to the initial detention, the district court found Cronin's detention of Wells to be a valid *Terry* stop, determining that the investigators had reasonable suspicion to believe Wells was engaged in suspicious activity. Further, the court found that "[u]nder the circumstances, Cronin was justified in removing

Wells from the Contour and placing him in handcuffs to pro-
tect the investigators and to prevent the destruction of evi-
dence while he conducted his investigation."

Regarding the search, the district court stated that it did not
find Wells' testimony that he did not give consent to Cronin to
be credible. The court concluded that Wells did initially give
consent for Cronin to search Wells. The district court further
concluded that Cronin's discovery of the plastic baggie, com-
bined with Wells' resistance in response, gave Cronin prob-
able cause to search further after Wells withdrew his consent.
Therefore, the subsequent search of Wells, after he withdrew
consent, was supported by probable cause and did not violate
the Fourth Amendment.

Wells was charged with one count of third degree assault
of an officer and one count of possession of a controlled sub-
stance. At a bench trial on January 24, 2014, the district court
found Wells guilty of both charges. On March 26, Wells was
sentenced to 12 to 30 months' imprisonment for the first count
and 12 to 18 months' imprisonment for the second count, with
the sentences to be served consecutively. Wells timely filed a
notice of appeal on April 14.

## ASSIGNMENTS OF ERROR

Wells assigns as error that (1) the court erred in overrul-
ing his motion to suppress and (2) the court erred in find-
ing him guilty of the offense of third degree assault on
an officer because insufficient evidence existed to support
said conviction.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to sup-
press based on a claimed violation of the Fourth Amendment,
we apply a two-part standard of review.[1] Regarding histori-
cal facts, we review the trial court's findings for clear error.[2]
But whether those facts trigger or violate Fourth Amendment

---

[1] *State v. Hedgcock*, 277 Neb. 805, 765 N.W.2d 469 (2009).

[2] *Id.*

protections is a question of law that we review independently of the trial court's determination.[3]

[2] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence, viewed and construed most favorably to the State, is sufficient to support the conviction.[4]

## ANALYSIS

*Motion to Suppress.*

[3,4] Wells assigns that the trial court erred in overruling his motion to suppress. At trial, Wells sought to exclude evidence gathered by Cronin on January 13, 2012, on the ground that it was obtained in violation of the Fourth Amendment. The Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution guarantee against unreasonable search and seizure. Evidence obtained as the fruit of an illegal search or seizure is inadmissible in a state prosecution and must be excluded.[5]

*Classifying Initial Detention.*

[5-9] To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*,[6] which describes the three levels, or tiers, of police-citizen encounters.[7] A tier-one police-citizen encounter involves the voluntary cooperation of the citizen elicited through noncoercive questioning and does not involve any restraint of the liberty

---

[3] *Id.*

[4] *State v. Keuhn*, 273 Neb. 219, 728 N.W.2d 589 (2007).

[5] See *State v. Kelley*, 265 Neb. 563, 658 N.W.2d 279 (2003).

[6] *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993).

[7] *State v. Hedgcock, supra* note 1.

of the citizen.[8] A tier-two police-citizen encounter constitutes an investigatory stop as defined by *Terry v. Ohio*.[9] Such an encounter involves a brief, nonintrusive detention during a frisk for weapons or preliminary questioning.[10] A tier-three police-citizen encounter constitutes an arrest.[11] An arrest involves a highly intrusive or lengthy search or detention.[12] Tier-two and tier-three police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution.[13]

[10] Wells argues that Cronin's use of handcuffs transformed an investigatory detention into a de facto arrest. When conducting an investigatory stop, an officer must employ "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."[14] If unreasonable force is used or if it lasts for an unreasonably long period of time, then a detention may turn into a de facto arrest.[15] An examination of the case law leads to the conclusion that there is often a gray area between investigatory detentions and arrests, and "'we must not adhere to "rigid time limitations" or "bright line rules," . . . but must use "common sense and ordinary human experience."'"[16]

This court has not discussed under what circumstances the use of handcuffs would transform an investigatory detention

---

[8] *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010).

[9] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). See *State v. Hedgcock, supra* note 1.

[10] *State v. Hedgcock, supra* note 1.

[11] *Id*. (citing *State v. Van Ackeren, supra* note 6).

[12] *Id*.

[13] *State v. Hedgcock, supra* note 1.

[14] *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983).

[15] *U.S. v. Maltais*, 403 F.3d 550 (8th Cir. 2005).

[16] *State v. Van Ackeren, supra* note 6, 242 Neb. at 490, 495 N.W.2d at 638 (quoting *United States v. Sharpe*, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985)).

into a custodial arrest. The use of handcuffs has been approved when it was reasonably necessary to protect officer safety during an investigative stop.[17] For example, in *United States v. Thompson*,[18] the defendant attempted to reach inside his coat pocket several times while an officer was performing a *Terry* frisk. The officer warned the defendant to stop or else he would place him in handcuffs.[19] After the defendant again tried to reach in his pocket, the officer put the defendant in handcuffs.[20] The Ninth Circuit held that the use of handcuffs was a reasonable precaution for officer safety and did not transform the stop into a custodial arrest.[21] And in *United States v. Purry*,[22] an officer detained a suspected bank robber. The officer placed the suspect in handcuffs after the suspect "'turned and pulled away'" when the officer put his arm on the suspect.[23] The District of Columbia Circuit determined that given the circumstances, the use of handcuffs constituted reasonable force and did not transform the stop into a custodial arrest.[24]

But the use of handcuffs may not be justified when the facts do not justify a belief that the suspect may be dangerous. In *State v. Williams*,[25] an officer was dispatched to investigate a burglar alarm sounding inside a nearby home. The officer noticed a car parked outside the front of the house, and as the officer approached, the car's headlights turned on and the car began to move.[26] The officer pulled his patrol car in front of

---

[17] See, e.g., *U.S. v. Miller*, 974 F.2d 953 (8th Cir. 1992); *U.S. v. Crittendon*, 883 F.2d 326 (4th Cir. 1989); *U.S. v. Hastamorir*, 881 F.2d 1551 (11th Cir. 1989); *U.S. v. Glenna*, 878 F.2d 967 (7th Cir. 1989).

[18] *United States v. Thompson*, 597 F.2d 187 (9th Cir. 1979).

[19] *Id*.

[20] *Id*.

[21] *Id*.

[22] *United States v. Purry*, 545 F.2d 217 (D.C. Cir. 1976).

[23] *Id*. at 219.

[24] *United States v. Purry, supra* note 22.

[25] *State v. Williams*, 102 Wash. 2d 733, 689 P.2d 1065 (1984).

[26] *Id*.

the vehicle and instructed the defendant to get out of the car.[27] The officer then handcuffed the suspect and put him in the back of his patrol car.[28] The Washington Supreme Court determined that the use of handcuffs could be appropriate under certain circumstances, but was not a reasonable precaution in this situation, because "[h]e did not threaten the police nor did the facts of the alleged crime justify assuming that the suspect was armed or likely to harm the police."[29] The use of force in that situation exceeded the scope of the *Terry* stop.

Whether the detention was reasonable under the circumstances in this case depends on a multitude of factors. We find useful those factors listed in *United States v. Jones*,[30] an Eighth Circuit case examining the reasonable use of force during a *Terry* stop, including

the number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

In *Jones*, two officers suspected the defendant of participating in a burglary. The defendant fled when the officers attempted to talk to him. The officers blocked the defendant's car from moving and unholstered their weapons while the defendant was out of their sight. The defendant argued that blocking the car and the use of weapons constituted a custodial arrest. The Eighth Circuit determined that the officers' use of force was reasonable and did not transform the investigatory stop into a full-blown arrest.

In this case, we find that the district court did not err in its determination that the detention constituted an investigatory

---

[27] *Id.*

[28] *Id.*

[29] *Id.* at 740, 689 P.2d at 1069.

[30] *United States v. Jones*, 759 F.2d 633, 639-40 (8th Cir. 1985).

stop. The record indicates that Cronin detained Wells in a reasonable manner under the circumstances, which stopped short of a full custodial arrest. Cronin had a strong suspicion Wells was in possession of a controlled substance. As Cronin approached the car, he witnessed Wells appear to be digging into his pocket, and when Cronin arrived at the car, Wells' right arm was concealed underneath his jacket. The nature of Wells' suspected crime, trafficking narcotics, further justified Cronin's action. In Cronin's past experience as a member of the Lincoln/Lancaster County drug task force, he knew that narcotics users and traffickers often carry weapons.[31] Also, the suspects outnumbered the investigators at the scene and Parker was on the other side of the car at the time of detention. Based on Wells' furtive movements and his apparent attempt to conceal something, Cronin had an immediate need for action. It does not appear that Cronin could have made the stop and, at the same time, ensured his safety in a less threatening manner. Finally, we note that Wells was detained only for a brief period of time before he allegedly assaulted Cronin and was placed under arrest.[32] Considering these circumstances, we conclude that Cronin's decision to gain control of Wells' arm and hand-cuff him while Cronin conducted his investigation was a "reasonable precaution . . . to protect [officer] safety and maintain the status quo."[33]

*Reasonable Suspicion.*

[11-14] Having classified the detention, we must next determine whether it was supported by sufficient reasonable suspicion that Wells was, or was about to be, engaged in criminal activity. An investigatory stop requires only that an officer have specific and articulable facts sufficient to give rise to a reasonable suspicion that criminal activity is afoot.[34] Whether a police officer has a reasonable suspicion based on

---

[31] See, also, *U.S. v. Miller, supra* note 17.

[32] See *State v. Verling*, 269 Neb. 610, 694 N.W.2d 632 (2005).

[33] *U.S. v. Martinez*, 462 F.3d 903, 907 (8th Cir. 2006).

[34] See *State v. Hedgcock, supra* note 1.

sufficient articulable facts depends on the totality of the cir-
cumstances and must be determined on a case-by-case basis.[35]
In determining whether a police officer acted reasonably, it
is not the officer's inchoate or unparticularized suspicion or
hunch that will be given due weight, but the specific reason-
able inferences which the officer is entitled to draw from the
facts in light of the officer's experience.[36] We review the dis-
trict court's finding of reasonable suspicion de novo.[37]

We have previously analyzed what could create reasonable
suspicion in the context of suspected pedestrian-vehicle drug
transactions in *State v. Ellington*.[38] In *Ellington*, we held that
the officer did not have reasonable suspicion to stop a defend-
ant when the officer observed, in an area known for narcotics,
the defendant lean into a vehicle with his arms extended into
the vehicle, appear to converse with the occupants, and then
walk away upon seeing the police cruiser.[39] Citing to cases
from several jurisdictions, we listed several factors, absent in
that case, which could give rise to reasonable suspicion that a
pedestrian-vehicle drug transaction took place:

> These jurisdictions have collectively concluded that when
> an officer does not recognize or know an individual;
> is not acting on particularized information from a third
> party; does not observe an exchange of items or money
> between the individual and another person; does not
> observe any movement, gestures, or attempts by the indi-
> vidual to conceal or hide objects; does not observe the
> individual repeatedly approach vehicles in a similar pat-
> tern of activity; and does not suspect the individual of any
> other crime, the officer's mere observation of a pedestrian
> leaning into a window of a stopped vehicle in a high-
> crime area and then walking away upon seeing the officer

---

[35] *State v. Louthan*, 275 Neb. 101, 744 N.W.2d 454 (2008).

[36] *State v. Kelley, supra* note 5.

[37] See *State v. Allen*, 269 Neb. 69, 690 N.W.2d 582 (2005), *disapproved on
other grounds*, *State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

[38] *State v. Ellington*, 242 Neb. 554, 495 N.W.2d 915 (1993).

[39] *Id*.

does not amount to a reasonable suspicion of drug-related activity warranting an investigatory stop.[40]

In *Ellington*, the officer did not know either the defendant or the occupants of the car, had not observed any similar encounters between the defendant and other motorists, did not see any objects or money exchange hands, and did not see the defendant attempt to conceal anything after leaving the car.[41]

The facts of the case at bar distinguish it from *Ellington*. Cronin recognized both Wells and the driver of the Buick as individuals with a history of narcotics trafficking and use. Before Wells arrived, the investigators also observed a pattern, over a 10-minute period, of several individuals walking up to the Buick in a manner consistent with the sale of narcotics. After interacting with the driver of the Buick, Wells was picked up by the Ford in another manner, according to Cronin, typical of pedestrian-vehicle drug transactions. To further support his suspicion, when the investigators arrived at the parking lot, Cronin recognized the driver of the Ford as another known drug trafficker/user. Cronin then observed Wells possibly hiding or concealing something in his pocket after Wells saw the investigators. This is all in addition to the fact that the entire sequence of events occurred in an area Cronin referred to as the "epicenter of narcotics" in Lincoln.

Based on the totality of the circumstances, the officers had reasonable suspicion, based upon sufficient, articulable facts, that Wells had been involved in a drug transaction, despite the fact that neither investigator actually observed the controlled substance or money changing hands. The district court did not err in determining that the officers had reasonable suspicion.

*Reasonableness of Search.*

[15,16] Wells argues that even if the initial detention was supported by reasonable suspicion, Cronin's search of Wells' pocket was an unreasonable search under the Fourth

---

[40] *Id*. at 559-60, 495 N.W.2d at 919.

[41] *Id*.

Amendment. Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment to the U.S. Constitution, subject only to a few specifically established and well-delineated exceptions.[42] The warrantless search exceptions recognized by the Nebraska Supreme Court include: (1) searches undertaken with consent, (2) searches under exigent circumstances, (3) inventory searches, (4) searches of evidence in plain view, and (5) searches incident to a valid arrest.[43]

The district court determined that after Wells was taken out of the car and handcuffed, he voluntarily gave consent for Cronin to search him. Cronin then proceeded to put his fingers into Wells' pocket, which is when Cronin felt the baggies. A struggle between the two subsequently ensued. Wells withdrew his consent after Cronin and Parker "took [Wells] to the ground," but Cronin continued to search Wells and recovered the baggie of crack cocaine from Wells' pocket. The district court found that Cronin's feeling the baggie with his fingers, combined with Wells' reaction to Cronin's discovery, gave Cronin probable cause to search Wells' person.

[17,18] Wells argues that the consent was not given voluntarily. Further, Wells maintains that if he did give consent, he consented only to a "pat down," and that Cronin exceeded the scope of the consent given by reaching into Wells' pocket. Even if we assume without deciding that Wells' consent was not voluntarily given and that Cronin exceeded the scope of any consent given, we nevertheless conclude that the retrieval of the crack cocaine from Wells' pocket constituted a valid search incident to arrest. "A search made without a warrant is valid if made incidental to a lawful arrest."[44] After an arrest is made, the arresting officer may search the person to "remove any weapons that the latter might seek to use in order to resist

---

[42] *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996).

[43] See *State v. Borst*, 281 Neb. 217, 795 N.W.2d 262 (2011). See, also, *City of Beatrice v. Meints*, 289 Neb. 558, 856 N.W.2d 410 (2014).

[44] *State v. Buckman*, 259 Neb. 924, 936, 613 N.W.2d 463, 475 (2000).

arrest or effect his escape" and also "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction."[45]

[19] We have yet to determine whether the search incident to a lawful arrest exception applies even if the suspect was arrested for resisting an unlawful search or seizure. However, Neb. Rev. Stat. § 28-1409(2) (Reissue 2008) diminishes the common-law right to resist unlawful arrest and provides that regardless of whether the arrest is legal, one may not forcibly resist an arrest. This statute on its face does not extend to illegal searches and seizures. The policy behind the abolition of the common-law right to resist unlawful arrest, however, applies equally to unlawful searches:

> Society has an interest in securing for its members the right to be free from unreasonable searches and seizures. Society also has an interest, however, in the orderly settlement of disputes between citizens and their government; it has an especially strong interest in minimizing the use of violent self-help in the resolution of those disputes. We think a proper accommodation of those interests requires that a person claiming to be aggrieved by a search conducted by a peace officer pursuant to an allegedly invalid warrant test that claim in a court of law and not forcibly resist the execution of the warrant at the place of search.[46]

This is the view the Nebraska Court of Appeals has taken in *State v. Coleman*.[47] In *Coleman*, the defendant bit an officer during a *Terry* frisk and was charged with assault on an officer.[48] The Court of Appeals determined that the officer did not have reasonable suspicion to initially detain the defendant and that therefore, the subsequent frisk was unconstitutional.[49]

---

[45] *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), *abrogated on other grounds, Arizona v. Gant*, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009).

[46] *United States v. Ferrone*, 438 F.2d 381, 390 (3d Cir. 1971).

[47] *State v. Coleman*, 10 Neb. App. 337, 630 N.W.2d 686 (2001).

[48] *Id*.

[49] *Id*.

Nevertheless, the Court of Appeals held that the assault conviction could stand, despite the fact that the defendant was resisting an unconstitutional search.[50] The Court of Appeals believed that "the rationale and policy behind the ban on resistance to arrests in § 28-1409(2) is applicable to the use of force to resist pat downs, even though the search may be later found to fail constitutional muster."[51] Several other jurisdictions have also extended the rule to prohibit resistance against illegal pat-down searches as well.[52] Accordingly, we agree with the Court of Appeals' reasoning in *Coleman* and hold that an illegal search would not justify the use of force in resisting an officer.

In the case at bar, after Wells allegedly kicked Cronin, Cronin had probable cause to arrest Wells for assault of an officer in the third degree. When Wells was subdued and held to the ground by Cronin's putting his knee into Wells' back, the initial detention was transformed into a custodial arrest. This arrest was valid regardless of whether Cronin's prior search was constitutional. Any search of Wells' person that occurred after that time, including Cronin's search of Wells' pockets from which Cronin ultimately retrieved the baggie, would fall under the search incident to a lawful arrest exception to the warrant requirement. Therefore, even if Cronin's initial search was unlawful, the evidence need not be suppressed under the exclusionary rule, because it can be justified under another exception to the warrant requirement. Wells' argument that the district court erred in denying his motion to suppress is without merit.

*Sufficiency of Evidence.*

[20,21] Wells further assigns that there was insufficient evidence to support Wells' conviction for third degree assault

---

[50] *Id.*

[51] *Id.* at 349, 630 N.W.2d at 697.

[52] See, e.g., *Elson v. State*, 659 P.2d 1195 (Alaska 1983); *State v. Ritter*, 472 N.W.2d 444 (N.D. 1991); *Com. v. Hill*, 264 Va. 541, 570 S.E.2d 805 (2002); *U.S. v. Mouscardy*, No. Crim. 10-10100-PBS, 2011 WL 2600550 (D. Mass. June 28, 2011) (unpublished memorandum and order), *affirmed* 722 F.3d 68 (1st Cir. 2013).

of an officer. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[53] As with any sufficiency claim, regardless of whether the evidence is direct, circumstantial, or a combination thereof, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact.[54]

[22,23] "A person commits the offense of assault on an officer in the third degree if . . . [h]e or she intentionally, knowingly, or recklessly causes bodily injury . . . [t]o a peace officer [and t]he offense is committed while such officer . . . is engaged in the performance of his or her official duties."[55] And Neb. Rev. Stat. § 28-109(4) (Reissue 2008) defines physical pain as a bodily injury. We have previously held that a conviction for assault on a peace officer in the third degree was supported by sufficient evidence showing that the defendant struck an officer and that the officer experienced physical pain as a result.[56]

At trial, Cronin testified that when he reached into Wells' pocket, Wells "attempted to try to spin around and began kicking backwards towards" Cronin. Cronin testified that Wells raised his left leg at the knee, cocked it back, and struck Cronin in the thigh and knee four or five times. Cronin stated that he felt pain in his knee and thigh area "for a few seconds or a minute afterwards," but that there were "no long-lasting effects" and that the kicks did not leave any lasting injuries. Wells denied kicking Cronin and testified that based on his position after being handcuffed, it would have been impossible for him to raise his leg the way Cronin described. Parker testified that he was on the other side of the car and

---

[53] See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[54] *State v. Norman*, 285 Neb. 72, 824 N.W.2d 739 (2013).

[55] Neb. Rev. Stat. § 28-931 (Cum. Supp. 2010).

[56] See *State v. Melton*, 239 Neb. 576, 477 N.W.2d 154 (1991).

did not witness the incident. Neither the State nor the defense presented additional evidence on this issue.

Without any other evidence to rely on, the district court found Cronin's testimony to be more credible than Wells' testimony. We are not in a position to reweigh the credibility of the witnesses.

Viewing the evidence in a light most favorable to the prosecution, which in this case would mean assuming Cronin's account of the incident is correct, there was sufficient evidence to find all essential elements of the crime beyond a reasonable doubt. The evidence establishes that Wells knew Cronin was a police officer performing his official duties and that Wells caused a bodily injury by kicking Cronin in the knee and thigh several times, which resulted in pain to Cronin. Wells' assignment of error is without merit.

## CONCLUSION

The judgment and sentences of the district court are affirmed.

Affirmed.

Wright, J., participating on briefs.

––––––––––––––––––

Terry J. Armstrong, appellant, v.
State of Nebraska, appellee.
___ N.W.2d ___

Filed February 20, 2015.    No. S-14-438.

1. **Workers' Compensation: Appeal and Error.** A judgment, order, or award of the compensation court may be modified, reversed, or set aside only upon the grounds that (1) the compensation court acted without or in excess of its powers, (2) the judgment, order, or award was procured by fraud, (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award, or (4) the findings of fact by the compensation court do not support the order or award.

2. ____: ____. On appellate review, the factual findings made by the trial judge of the Workers' Compensation Court have the effect of a jury verdict and will not be disturbed unless clearly wrong.

3. ____: ____. In workers' compensation cases, an appellate court determines questions of law.